**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

FIRST COMMONWEALTH BANK, )
          )
       Plaintiff, )
          )    **CIVIL ACTION NO. 3:10-231**
    v. )
          )    **JUDGE KIM R. GIBSON**
FRESH HARVEST RIVER, LLC, )
          )
       Defendant. )

<u>**MEMORANDUM AND ORDER**</u>

**I.**    **SYNOPSIS**

Pending before the Court are two nearly identical petitions to open or strike confessions of judgment ("Petitions") in two related cases.[1] The Court of Common Pleas of Clearfield County, Pennsylvania, entered two separate judgments by confession in favor of Plaintiff First Commonwealth Bank ("the Bank") and against Defendant Fresh Harvest River, LLC ("FHR") on August 10, 2010, in connection with two credit line loan agreements. (ECF No. 31-1 at 21). FHR now asks this Court to open or strike those judgments, claiming that "it was [un]lawful for First Commonwealth Bank to confess judgment against Fresh Harvest." (ECF No. 1 ¶ 8). The parties have fully briefed the Court, and this matter is now ripe for adjudication. For the reasons explained below, the Court will **DENY** FHR's Petitions.[2]

---

[1] The only difference between the two cases is the type of loan involved and the amount of the confessed judgment. The instant case, No. 3:10-cv-231, involves a revolving line of credit and a confession of judgment in the amount of $95,567.78, while the companion case, No. 3:10-cv-232, involves a non-revolving line of credit and a confession of judgment in the amount of $3,082,146.24. Because the underlying facts and issues in both cases are the same, the Court will address both Petitions in this memorandum and order. A similar memorandum and order will be docketed in the companion case at No. 3:10-cv-232.

[2] Both of FHR's Petitions also include a motion to stay enforcement of the confessed judgments. Because the Court denies FHR's Petitions to open or strike, FHR's motions to stay enforcement are also denied.

## II.  JURISDICTION AND VENUE

The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Venue is proper

under 28 U.S.C. §§ 1332 and 1441(a).

## III.  BACKGROUND

This matter—which is one of several cases resulting from the underlying

dispute[3]—arises from a series of negotiations and agreements between the Bank and FHR

related to a food manufacturing plant in Dubois, Pennsylvania.  Specifically, the instant

dispute involves FHR's default on two credit lines:  (1) a revolving line of credit, and (2) a

non-revolving line of credit.  After FHR defaulted on these two loans, the Bank obtained a

confession of judgment in the state court against FHR on each line of credit.  The crux of

this dispute is whether it was lawful for the Bank to confess judgment against FHR in light

of FHR's asserted defenses.

### A.  Factual Background

The parties have extensively recited the facts of this case in their various briefs,

exhibits, and other relevant filings.  Below is a brief summary of the most salient facts

contained in the record before the Court.[4]

### *The Plant*

In March 2009, the Bank acquired ownership of a food manufacturing plant in

Dubois, Pennsylvania (the "Plant"), through a mortgage foreclosure.  (ECF No. 41 ¶ 6).

---

[3] In addition to the two cases currently pending before this Court (No. 3:10-cv-231 and No. 3:10-cv-232), the underlying dispute has spawned three other cases docketed in the Western District:  No. 2:10-cv-1140, No. 2:11-cv-583, and No. 2:13-cv-212; as well as a Bankruptcy Court case in the Southern District of New York, No. 10-14814, and numerous Pennsylvania state court actions.

[4] Judge McVerry excellently explained in detail the factual background to the events giving rise to this case in a memorandum opinion and order in a related case.  *See Catahama, LLC v. First Commonwealth Bank*, No. 2:10-cv-1140, 2011 WL 2533018, at *1-4 (W.D. Pa. June 24, 2011).

The Plant included both (1) the land and the buildings (the "real estate") and (2) the food manufacturing equipment (the "equipment"). (*Id*. ¶¶ 4, 5). After repossessing the Plant, the Bank began to search for a buyer.

The Bank contacted Jack Gray to solicit his help in finding a buyer. (ECF No. 43-1, ¶ 3). Gray became interested in purchasing the Plant and approached his business partners, Paul Grillo and Edmund Abramson, to pursue this business venture. (*Id*. ¶ 7). Together, they formed FHR to acquire the Plant. (*Id*. ¶ 8). Subsequently, the Bank and FHR entered negotiations for the sale of the Plant's real estate and equipment. During the negotiations, FHR operated the Plant under a real estate lease and an equipment lease, as described below. (ECF No. 41, ¶ 7).

### The Real Estate Lease

In a lease agreement dated April 1, 2009, the Bank agreed to lease the Plant real estate to FHR. (ECF No. 41, ¶ 8). This real estate lease was extended several times in the following months, during which the Bank and FHR attempted to negotiate the sale of the Plant real estate. (*Id*. ¶¶ 9-10). On August 1, 2009, the parties executed a first amendment to the lease, and on August 31, 2009, the parties executed a second amendment to the lease, establishing a lease expiration date of October 30, 2009. (*Id*. ¶¶ 11-12).

### The Equipment Lease

In a separate lease agreement between the Bank and FHR dated June 23, 2009, the Bank agreed to lease the Plant equipment to FHR. (ECF No. 41 ¶ 13). The equipment lease required FHR to pay the Bank $80,000 per month beginning on January 1, 2010, and extending through June 1, 2012. (*Id*. ¶ 14). The equipment lease included an option for FHR to purchase the equipment for $16,000,000 during the term of the lease. (*Id*. ¶ 15).

### The Credit Lines

On June 23, 2009, FHR obtained two loans (the "credit lines") from the Bank to provide operating capital for the Plant: (1) a revolving line of credit with a maximum principal amount of $3,000,000, and (2) a non-revolving line of credit with a maximum principal amount of $3,000,000. (ECF No. 31-1, Compl. ¶ 3; No. 41 ¶ 17). Each loan was evidenced by a separate promissory note (the "Notes"). (ECF No. 31-1 at 6-13, Ex. A). Each Note contained a warrant of attorney clause, authorizing the Bank to confess judgment against FHR in the event of default. (*Id*. at 11).

Additionally, FHR entered into a separate credit line security agreement with the Bank for each line of credit, in which FHR assigned and pledged to the Bank first lien position security interests in FHR's business assets including all present and future accounts and inventory. (ECF No. 41 ¶ 20; ECF No. 39-12).

Also, FHR signed a disclosure for confession of judgment for each line of credit. (ECF No. 31-1 at 15, Ex. B). In the disclosures, FHR acknowledged that the Notes contained a confession of judgment provision that would permit the Bank to enter judgment against FHR upon a default on the Note without affording FHR an opportunity to defend against the entry of judgment. (*Id*.). In the disclosures, FHR acknowledged that FHR was represented by its own independent legal counsel. (*Id*.).

### The Sales Agreement

On August 31, 2009, the Bank and FHR entered into a sales agreement ("Sales Agreement"), in which FHR agreed to purchase the Plant real estate for $10,000,000. (ECF No. 39-10). The Sales Agreement specifically excluded the Plant equipment. (*Id*. at 6). Among other things, the Sales Agreement required FHR to tender a $2,500,000 cash

payment on the purchase price at the time of closing. (*Id*. at 9). The Sales Agreement set a closing date of October 30, 2009. (*Id*. at 10).

### *The Defaults and Termination of the Agreements*

The closing on the sale of the Plant did not occur by October 30, 2009, as required in the Sales Agreement, and the sale was never consummated. (ECF No. 41 ¶¶ 27-28). On May 6, 2010, the Bank sent a letter notifying FHR that the Bank was terminating the Sales Agreement. (ECF No. 30 ¶ 44). The termination letter stated that, because the "closing did not occur on October 30th due to the inability of FHR to pay the cash portion of the purchase price as required" by the Sales Agreement, the Bank was exercising its rights under the Sales Agreement by declaring FHR to be in default and electing to terminate the Sales Agreement. (ECF 39-16 at 2-3).

Despite FHR's inability to furnish the $2,500,000 required to close the Sales Agreement, FHR continued to borrow on the credit lines. (ECF No. 30 ¶¶ 20, 29). By January 2010, FHR had borrowed the full $3,000,000 available under the non-revolving line of credit and the maximum amount available under the revolving line of credit.[5] (ECF No. 30 ¶ 30; ECF No. 41 ¶ 32). Thereafter, FHR failed to make certain required payments on the credit lines. (ECF No. 41 ¶¶ 21-24). On May 6, 2010, the Bank sent a notice of default to FHR for each line of credit, advising FHR that it was in default on the loans. (ECF No. 31-1 at 16-17, Ex. C). The Bank advised FHR that, if FHR did not cure the defaults by 5:00 p.m. on May 17, 2010, then the Bank would exercise its remedies under the loan agreements, the Notes, and other related documents. (*Id*.). After FHR failed to

---

[5] Apparently, the revolving line of credit was subject to a borrowing formula set forth in the revolving line of credit loan agreement, thus limiting FHR's ability to borrow the full $3,000,000 amount available on that line of credit. (*See* ECF No. 41 ¶ 32).

cure the default, the Bank sent FHR a notice of acceleration on each credit line on May 18, 2010. (ECF No. 30 ¶ 45). Thereafter, as explained below, the Bank obtained a confession of judgment on each credit line.

### B. Procedural Background

On August 10, 2010, the Bank filed a separate complaint in confession of judgment on each line of credit in the Court of Common Pleas of Clearfield County, Pennsylvania. The complaint on the revolving line of credit was docketed at case number 2010-1409-CD, and the complaint on the non-revolving line of credit was docketed at case number 2010-1410-CD. (*See* ECF No. 31-1, Ex. A). That same day, the state court Prothonotary entered judgment in favor of the Bank against FHR in the amount of $95,567.78 on the revolving line of credit and $3,082,146.24 on the non-revolving line of credit. (*See* ECF No. 31-1 at 21). On September 10, 2010, FHR filed a Petition to open or strike the confession of judgment in each case and removed both cases to this Court (ECF No. 1).

On February 4, 2013, the Bank filed a brief in opposition (ECF No. 19) to each Petition along with a number of exhibits (*see* ECF No. 19-1); and on March 11, 2013, FHR filed a brief in support (ECF No. 27) of each Petition. After denying Bank's motion for remand (*see* ECF No. 11), the Court permitted a limited discovery period—restricted to discovering information relevant to whether FHR's Petitions should be granted (*see* ECF No. 29)—and requested that the parties more fully brief the Court (*see* ECF No. 36).

The Court also directed the parties to review and clarify the record in each case by filing amended documents due to certain discrepancies in the parties' filings. (*See* ECF No. 29). Pursuant to the Court's order, FHR refiled both Petitions on April 24, 2013, (ECF No. 30), and an amended notice of removal in each case (ECF No. 31).

On October 1, 2013, the Bank filed a reply brief in opposition (ECF No. 37) to each Petition, along with a concise statement of material facts (ECF No. 38) and an appendix of exhibits (ECF No. 39). On November 5, 2013, FHR filed a brief in support (ECF No. 40) of each Petition, along with a concise statement of material facts (ECF No. 42) and an appendix of exhibits (ECF No. 43). FHR also filed a response (ECF No. 41) to Bank's concise statement of material facts. Thereafter, with leave from the Court (*see* ECF No. 46), the Bank filed a reply brief (ECF No. 47) in response to FHR's brief in support. This Court held oral argument on January 15, 2014. (*See* ECF No. 52).

## IV.    LEGAL STANDARD

FHR has moved to open or strike the confession of judgment obtained by the Bank on each line of credit. Even though "[j]udgment by confession is an unusual creation of Pennsylvania law and has been the subject of much federal court criticism," the legal standard is nevertheless well settled. *Mobile Transp. Technologies, Inc. v. S.I. ScooterWorks LLC*, 176 F. Supp. 2d 340, 341 (E.D. Pa. 2001). The Third Circuit has made the following observations concerning motions to open or strike a judgment by confession in Pennsylvania:

> Judgment by confession is a product of state law, having no analog in the federal rules. In Pennsylvania, the state's Rules of Civil Procedure prescribe the procedures and filing prerequisites for obtaining confessed judgments and, in effect, affirm the validity of contractual waivers of prejudgment procedures in Pennsylvania. Pennsylvania's rules of procedure also prescribe how a confessed judgment may be successfully attacked. By motion to open the judgment, a defendant may assert defenses going to the merits of the alleged default. If the defendant presents evidence in support of a meritorious defense sufficient to create a triable issue of fact, the judgment will be opened. Execution on the judgment will then be stayed until the court can resolve the disputed claims, but the judgment remains in effect as a judicial lien.

A motion to strike, on the other hand, tests the sufficiency of the record upon which the confessed judgment was entered. The court takes all the plaintiff's allegations as true and will grant the motion only to remedy a "fatal defect or irregularity appear[ing] on the face of the record or judgment."

\* \* \*

A petition to strike and a petition to open are two forms of relief with separate remedies; each is intended to relieve a different type of defect in the confession of judgment proceedings. A petition to strike off the judgment reaches defects apparent on the face of the record, while a petition to open the judgment offers to show that the defendant can prove a defense to all or part of the plaintiff's claim.

*F.D.I.C. v. Deglau*, 207 F.3d 153, 159, 167 (3d Cir. 2000) (citations omitted).

Thus, while Rule 60 of the Federal Rules of Civil Procedure governs the procedural aspects of a request to open or strike a confession of judgment, Pennsylvania law governs the substantive issues regarding whether to open or strike the judgment. *Deglau*, 207 F.3d at 161, 166; *see also Mobile Transp. Technologies*, 176 F. Supp. 2d at 341. Furthermore, as noted above, a motion to open and a motion to strike are two distinct forms of relief and require two separate avenues of analysis, as set forth below. *See Textron Fin. Corp. v. Vacation Charters, Ltd.*, No. 3:11-cv-1957, 2012 WL 760602, \*2 (M.D. Pa. Mar. 8, 2012).

### A.    Motion to Open Judgment

Pursuant to Rule 2959 of the Pennsylvania Rules of Civil Procedure, "a defendant may challenge a confessed judgment by filing a petition to open." *Mobile Transp. Technologies*, 176 F. Supp. at 341. The Court may open a confessed judgment only where a party presents evidence "which in a jury trial would require that the issues be submitted to the jury." *Germantown Sav. Bank v. Talacki*, 657 A.2d 1285, 1288-89 (Pa. Super. Ct. 1995) (quoting Pa. R. Civ. P. 2959(e)). Such relief is to be granted only in "a limited number of circumstances," and specifically where the moving party "acts promptly, alleges

8

a meritorious defense and presents sufficient evidence of that defense to require submission of the issues to the jury." *First Seneca Bank & Trust Co. v. Laurel Mountain Dev. Corp.*, 485 A.2d 1086, 1088 (Pa. 1984). To determine whether a triable issue exists, the directed verdict standard is used. *Deglau*, 207 F.3d at 168 (citing *Suburban Mechanical Contractors, Inc. v. Leo*, 502 A.2d 230, 232 (Pa. Super. Ct. 1985). Accordingly, the Court must view the evidence in the light most favorable to the petitioner and accept as true all evidence and proper inferences, which support the defense, while rejecting adverse allegations of the party obtaining the judgment. *Deglau*, 207 F.3d at 168.

For evidence to be sufficient to raise a jury question, it must be "clear, direct, precise and believable." *Germantown Sav. Bank*, 657 A.2d at 1289. The opening of a confessed judgment is equitable in nature, *Mobile Transp. Technologies*, 176 F. Supp. 2d at 342, and is within the Court's sound discretion. *Liazis v. Kosta, Inc.*, 421 Pa.Super. 502, 506, 618 A.2d 450, 452 (Pa. Super. Ct. 1992).

### B. Motion to Strike Judgment

A court should grant a motion to strike a judgment only if a fatal defect or irregularity appears on the face of the judgment, and the defect is alleged in the motion to strike. *Deglau*, 207 F.3d at 167 (citing *Manor Bldg. Corp. v. Manor Complex Associates*, 645 A.2d 843, 846 (Pa. Super. Ct. 1994)). The court must review both the confession of judgment clause and the complaint itself to determine whether there is a defect. *Id*. The facts averred in the complaint must be taken as true. *Id*.

## V. DISCUSSION

As Judge McVerry opined, this protracted litigation is the result of a failed business venture. *Catahama, LLC v. First Commonwealth Bank*, No. 2:10-cv-1140, 2011 WL

2533018, at *1 (W.D. Pa. June 24, 2011). The sole issue now pending before this Court is whether the Court should open or strike the confessed judgments previously entered in favor of the Bank on the two credit lines and permit FHR to litigate its defenses before a jury. The crux of FHR's argument is that, in the course of ongoing negotiations between FHR and the Bank, the Bank made certain assurances, promises, waivers, and oral modifications—related to the various agreements, notes, and contracts—upon which FHR detrimentally relied and which now form the basis for FHR's defenses. FHR argues that the Bank's allegedly unlawful actions related to the negotiations should rescue FHR from its default on the credit lines and save FHR from the confessions of judgment. The Court will separately decide whether to open the judgments and whether to strike the judgments, and will address each of FHR's six defenses below.

### A.    FHR's Petitions to Open the Judgments

FHR seeks to open the confessed judgments entered in connection with the two credit lines. (ECF No. 30, ¶ 8). FHR raises six separate but related defenses. FHR asserts:

(1) The Bank is in material breach of the agreements relating to the Plant real estate and equipment and the credit lines. (*Id*. ¶ 80).

(2) The Bank failed to negotiate the agreements with FHR in good faith. (*Id*. ¶ 81).

(3) The Bank and FHR orally modified the various agreements, including the credit line Notes, reducing the amount owed to the Bank. (*Id*. ¶ 82).

(4) The Bank is estopped from exercising its rights under the agreements. (*Id*. ¶ 83).

(5) FHR detrimentally relied on the Bank's promises. (*Id*. ¶ 84).

(6) The agreements contain certain clauses under which FHR is deprived of its due process rights. (*Id*. ¶ 85).

FHR consolidates its argument on the defenses into "essentially two separate sets of reasons why the Bank's entry of judgment was improper." (ECF No. 40 at 6). First, FHR claims that the Bank breached the "interrelated" agreements, and that the confessed judgments on the credit lines were therefore unlawful because the Sales Agreement was improperly terminated. Second, FHR claims that the Bank orally assured FHR that the default letters were a formality and that FHR need not make the demanded payments, and orally agreed to reduce the amount owed by FHR under the credit lines.

In response, the Bank argues that FHR's defenses are meritless. Like FHR, the Bank consolidates its argument on the defenses, treating the first five of FHR's defenses as one group of "contract based defenses," and separately addressing FHR's due process defense. (*See* ECF No. 37 at 9). The Bank also argues that FHR is precluded from raising its defenses before this Court based on the doctrine of collateral estoppel.

In light of the structure of the parties' arguments, the Court will address FHR's defenses under four general categories: (1) the Defective Notices and Bank's Breach of the Agreements, (2) FHR's Estoppel Arguments, (3) the Oral Modification of the Credit Line Payment Obligations, and (4) FHR's Due Process Argument. However, before evaluating FHR's defenses, the Court will first consider the Bank's collateral estoppel argument.

### 1.    Collateral Estoppel Argument

The Bank contends that the defenses in FHR's petition have already been litigated and decided against FHR in favor of the Bank in related cases in both state and federal court. (ECF No. 37 at 17). Thus, the Bank argues, FHR is precluded from raising those

same issues before this Court. Specifically, the Bank argues (1) Judge Cherry, in a Pennsylvania court of common pleas opinion and order, decided that the Bank had properly terminated the Sales Agreement and that the parties could not have entered an enforceable oral modification of the Sales Agreement under the Statute of Frauds; and (2) Judge McVerry, in a federal court opinion and order, decided that FHR's allegations failed to state a claim against the Bank for promissory estoppel. (ECF No. 37 at 17).

In response, FHR contends that collateral estoppel does not bar the defenses raised in the Petitions for two reasons. (ECF No. 27 at 6). First, FHR argues that, because the Pennsylvania Superior Court dismissed FHR's appeal of Judge Cherry's order on grounds of mootness rather than on the merits, Judge Cherry's order was not subject to appellate review and the decision therefore has no preclusive effect. (*Id*.). Second, FHR argues that the Bank has taken inconsistent positions and is judicially estopped from changing its position yet again before this Court. (*Id*.).

### a. Legal Standard for Collateral Estoppel

Under the doctrine of collateral estoppel, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Bailey v. Ness*, 733 F.2d 279, 281 (3d Cir. 1984) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).

Where a party seeks to rely on the preclusive effect of a state court judgment, the federal court must look to state law—here, Pennsylvania law—and its assessment of the collateral estoppel doctrine to determine the extent to which the state would give its own judgment collateral estoppel effect. *Bailey*, 733 F.2d at 281; *see also Ranger Ins. Co. v. Gen. Acc. Fire & Life Assur. Corp., Ltd.*, 800 F.2d 329, 330 (3d Cir. 1986). In

Pennsylvania, the doctrine of collateral estoppel applies when the following four elements are met:  (1) the issue decided in the prior action is identical to the one presented in the later action; (2) the prior action resulted in a final judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action.  *See Rue v. K–Mart Corporation*, 713 A.2d 82, 84 (Pa. 1998); *Public Service Mut. Ins. Co. v. Cohen*, 616 F.2d 704, 707 (3d Cir. 1980).

Similarly, where the prior judgment was rendered by a federal court, the Court applies federal principles of collateral estoppel, which requires the following elements to be present:  (1) the issue sought to be precluded must be the same as the one involved in the prior action; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the prior judgment.  *In re Docteroff*, 133 F.3d 210, 214 (3d Cir. 1997); *see also Albanese v. Emerson Elec. Co.*, 552 F. Supp. 694, 700 (D. Del. 1982).

### b.     Judge Cherry's Opinion

On September 3, 2010, Judge Cherry in the Court of Common Pleas of Clearfield County, Pennsylvania, entered an opinion and order in *First Commonwealth Bank v. Fresh Harvest River*, at No. 2010-1302-CD ("Cherry Opinion").[6]  Among other things, Judge Cherry ordered:

> Having failed to state any prima facie meritorious defenses to Plaintiff's Complaint, the Court DENIES Defendant's Petition to Open and/or Strike Judgment Obtained by Confession of Judgment.

---

[6] Judge Cherry's opinion is docketed in the instant case at ECF No. 39-21.

(Cherry Opinion, ECF No. 39-21 at 15). The Bank now asserts that the analysis and holding in Judge Cherry's Opinion is binding on the issues before this Court and precludes FHR from re-litigating those issues.

The Court will address Pennsylvania's four-pronged test, stated above, to determine whether collateral estoppel applies. Prongs one, three, and four of the test are not in dispute. Regarding the first prong, the issues decided in the action before Judge Cherry are identical to the issues before this Court. The case before Judge Cherry was based on the Bank's complaint in confession of judgment in ejectment regarding the Plant. While the instant case involves the Bank's complaints in confession of judgment on the credit lines rather than an action in ejectment, the judgments on the credit lines were executed simultaneously with the judgment in ejectment and arise from the same set of facts and agreements between the parties. More importantly, the asserted defenses in the case before Judge Cherry are identical to those asserted by FHR in the instant case.

FHR concedes that the issues are the same. FHR argues to this Court that Judge Cherry "refus[ed] to open another judgment by confession in a related dispute between the Bank and FHR."[7] (ECF No. 27 at 6). FHR maintains, "[T]he Bank attempts to separate the judgments by confession at issue here from the separate judgment by confession (relating to the real estate) at issue in [Judge Cherry's Opinion], suggesting one has nothing to do with the other. This is wholly disingenuous. . . . [A]ll of the agreements between the parties were interrelated." (ECF No. 27 at 19). Accordingly, the first prong is satisfied.

---

[7] FHR asserts that Judge Cherry's "analysis was simply wrong as a matter of law and . . . does not preclude this Court from getting the law right." (ECF No. 27 at 20). This Court does not conduct appellate review of the state trial court. The four-part test set forth above governs the application of collateral estoppel. The litigants' agreement or disagreement with the state court's analysis is not an appropriate factor for consideration.

Regarding the third prong, FHR, which is the party against whom collateral estoppel is being asserted, was the Defendant in the action before Judge Cherry. Likewise, regarding the fourth prong, FHR had a full and fair opportunity to litigate the issues before Judge Cherry. In his Opinion, Judge Cherry noted that "a hearing was held on the Petition, at which time both parties were ordered to submit briefs on the issue . . ." (Cherry Opinion, ECF No. 39-21 at 2). Further, Judge Cherry's Opinion provides thorough analysis of FHR's asserted defenses and the various issues in dispute, demonstrating that FHR was afforded a full and fair opportunity to litigate the issues, satisfying the fourth prong. (*See* Cherry Opinion, ECF No. 39-21 at 10-14).

FHR bases its argument—that collateral estoppel should not apply—on the second prong: determining whether the action before Judge Cherry resulted in a final judgment on the merits. Under Pennsylvania law, a confession of judgment is a final judgment and may bar a collateral challenge to the judgment. *Klecha v. Bear*, 712 F. Supp. 44, 46 (M.D. Pa. 1989); *Zhang v. Southeastern Fin. Group., Inc.*, 980 F. Supp. 787, 792 (E.D. Pa. 1997).

Nevertheless, citing *Peach Bottom Twp. V. Peach Bottom Twp. Zoning Hearing Bd.*, 526 A.2d 837, 839 (Pa. Commw. Ct. 1987), FHR contends that, because the Pennsylvania Superior Court dismissed FHR's appeal on grounds of mootness, Judge Cherry's Opinion was not subjected to appellate review and is not a final judgment on the merits.[8] FHR asserts that because the Bank moved to "dismiss the appeal as moot rather than arguing on

---

[8] In *Peach Bottom*, the Court reiterated the long standing rule announced in *Allegheny County v. Maryland Casualty Co.*, 146 F.2d 633 (3rd Cir. 1944), that, "under Pennsylvania law, where a party to a judgment cannot obtain appellate review because the matter becomes moot, the judgment against him is not conclusive in a subsequent action on a different cause of action." *Peach Bottom Twp.*, 526 A.2d at 839. The Court finds the rule inapplicable here, where FHR's appeal was rendered moot because FHR failed to post a bond in order to keep the confession of judgment in ejectment a live controversy. The Court finds that, while FHR's appeal technically was dismissed as moot, the issue is more analogous to a failure to appeal—which does not prevent preclusion—because FHR failed to comply with appellate procedure by posting the requisite bond. FHR could have obtained appellate review, but failed to do so by its own conduct. *See Harris v. Martin*, 834 F.2d 361, 365 (3d Cir. 1984).

the merits that Judge Cherry should be affirmed," the Bank deprived FHR of appellate review on the merits, "thereby render[ing] the Common Pleas Opinion useless for any future collateral estoppel purposes." (ECF No. 27 at 10-11).

The Court finds FHR's argument unavailing and the rule expressed in *Peach Bottom* distinguishable. Here, FHR failed to post a $20,000,000 bond required by the Supersedeas Order of Judge Cherry pursuant to Pa. R. App. P. 1733 (*see* ECF No. 39-22), resulting in dismissal by the Superior Court (*see* ECF No. 39-23). The state court case became moot because of FHR's own decision not to post bond. As such, "collateral estoppel still attaches when the party against whom the defense is raised is the party who causes the case to become moot." *Campbell v. Lake Hallowell Homeowners Ass'n*, 852 A.2d 1029, 1041 (Md. Ct. Spec. App. 2004) (citing *Gelpi v. Tugwell*, 123 F.2d 377, 379 (1st Cir. 1941)); *United States v. Munsingwear, Inc.*, 178 F.2d 204, 208 (8th Cir. 1949) *aff'd*, 340 U.S. 36 (1950).

The Superior Court dismissed FHR's appeal because FHR failed to exhaust its remedies by posting a bond. Accordingly, FHR's argument—that collateral estoppel does not attach because the appellate court did not reach a final judgment on the merits—is without merit because FHR caused the appeal to be dismissed by failing to comply with the procedural requirements for an appeal. *See, e.g.*, *In re Docteroff*, 133 F.3d 210, 215 (3d Cir. 1997). Additionally, the Court notes that FHR appealed the order of the Pennsylvania Superior Court and the Pennsylvania Supreme Court denied review. *See First Com. Bank v. Fresh Harvest River, LLC*, 47 A.3d 848 (Pa. 2012); *accord*, *Sicalides v. Hartford Cas. Ins. Co.*, 94 F. App'x 882, 884 (3d Cir. 2004); *Robbins v. Buck*, 827 A.2d 1213, 1214 (Pa. Super. Ct. 2003). Having resolved FHR's mootness argument, the Court finds that,

because Judge Cherry's Opinion constitutes a final judgment on the merits, the second prong of the test is satisfied. Thus, Judge Cherry's Opinion is entitled to preclusive effect.

As will be explained in more detail below, Judge Cherry's findings (*see* Cherry Opinion, ECF No. 39-21 at 11-12) are fatal to FHR's defenses regarding the confessions of judgment on the credit lines. FHR contends that the Bank breached the Sales Agreement, that the Bank wrongfully terminated the Sales Agreement, and that, as a result, the Bank's confessions of judgment were unlawful. However, because Judge Cherry concluded—and this Court agrees[9]—that the Bank did not breach the Sales Agreement, but legally terminated the Sales Agreement, FHR's defenses are without merit.

### c.   Judge McVerry's Opinion

Like Judge Cherry's Opinion, Judge McVerry's Opinion has a preclusive effect on issues before this Court. Because Judge McVerry's Opinion is a federal court decision,[10] the Court applies federal principles of collateral estoppel, rather than the Pennsylvania test applied above. *See Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 145 (3d Cir. 1999); *In re Masdea*, 307 B.R. 466, 472 (Bankr. W.D. Pa. 2004).

Regarding the first prong, the issues raised before Judge McVerry concerning the Bank's failure to negotiate in good faith and promissory estoppel are identical to those same defenses raised before this Court. FHR concedes that the defenses raised in this case

_____

[9] FHR urges this Court, "The Common Pleas Opinion . . . analysis was simply wrong as a matter of law and . . . does not preclude this Court from getting the law right." (ECF No. 27 at 20). Even if this Court were to conclude that Judge Cherry's opinion is not entitled to preclusive effect, the Court would nevertheless reach the same conclusion as Judge Cherry, and for the same reasons.

[10] In its brief, the Bank cited the Pennsylvania test applied above in arguing that collateral estoppel applied to Judge McVerry's Opinion. *See, e.g., Clunie-Haskins v. State Farm Fire & Cas. Co.*, 855 F. Supp. 2d 380, 386-87 (E.D. Pa. 2012) ("The preclusive effect of a prior district court judgment is determined based on federal common law, which, in diversity cases, 'incorporates the rules of preclusion applied by the State in which the rendering court sits.'" (quoting *Taylor v. Sturgell*, 553 U.S. 880, 891 n. 4 (2008))). Regardless of which test is used, the result is the same—Judge McVerry's Opinion is entitled to preclusive effect in the instant case.

are identical to those "already raised in a prior pending proceeding before [Judge McVerry]." (ECF No. 30 ¶ 7).

Regarding the second and third prongs, the action before Judge McVerry resulted in valid and final judgment on the merits in which the issue was actually litigated. *See* Case No. 2:10-cv-1140, ECF No. 176. Reviewing the docket at case number 2:10-cv-1140, it is evident that FHR had a full and fair opportunity to litigate the issues in the action before Judge McVerry. Finally, the determination was essential to the prior judgment in that the issue formed the basis for the dismissal of the Bank from that action.

The Court also notes that the elements from the Pennsylvania test which are not specifically referenced in the federal test are also met. Specifically, Catahama, as assignee of FHR and thus in privity with FHR, litigated the claims against the Bank, satisfying the same party requirement.[11] *See Rhode Island Hosp. Trust Nat. Bank v. Ohio Cas. Ins. Co.*, 789 F.2d 74, 82 (1st Cir. 1986); *Tycom Corp. v. Redactron Corp.*, 380 F. Supp. 1183, 1189 (D. Del. 1974). Accordingly, collateral estoppel applies to the issues in the instant case that were previously litigated before Judge McVerry.

### d.     FHR's Judicial Estoppel Argument

FHR argues that the Bank has taken inconsistent positions in the prior actions and should be estopped from changing its position yet again before this Court under the doctrine of judicial estoppel. (ECF No. 27 at 11). According to FHR, the Bank represented to the Superior Court during the appeal of Judge Cherry's opinion that the issues raised in that case could be addressed in a separate action without the preclusive

---

[11] The Court further notes that FHR filed the Complaint in the case, but that in December 2010, FHR assigned to Catahama all claims and causes of action that FHR had against the Bank, after which Catahama filed an Amended Complaint (*see* No. 2:10-cv-1140, ECF No. 48) and terminated FHR as a party to the action.

effect of collateral estoppel, but the Bank is now asserting collateral estoppel on those very issues. (*Id*. at 12-13).

FHR's argument is misplaced. The case before Judge Cherry, and the subsequent appeal to the Superior Court, involved a confession of judgment in ejectment. The Bank moved to dismiss the appeal in that case on grounds of mootness, due to FHR's failure to post bond and its subsequent surrender of the premises. FHR correctly notes that the Bank explained to the Superior Court that if FHR wished to further litigate the issues in that case, it could do so by initiating its own action in ejectment. But, FHR has not done so. Instead, the instant case arises from the confessions of judgment on the credit lines, which have nothing to do with the ownership of the Plant real estate or equipment. Contrary to FHR's allegations that the Bank is "playing fast and loose" with the Court, the Bank has not asserted inconsistent positions. Accordingly, FHR has not satisfied the elements for judicial estoppel. *See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 319-20 (3d Cir. 2003); *Scarano v. Cent. R. Co. of N. J.*, 203 F.2d 510, 512 (3d Cir. 1953).

### e. Conclusion

Inasmuch as the opinions by Judge Cherry and Judge McVerry address the same issues raised by FHR in the instant case, those opinions have a preclusive effect and bar FHR from re-litigating those same issues before this Court. However, even though the doctrine of collateral estoppel alone might be sufficient to deny FHR's Petitions, the Court will nevertheless evaluate FHR's asserted defenses to determine whether FHR has presented sufficient evidence to submit its defenses to a jury.

## 2.  Defective Notices

FHR's first defense is that the Bank breached the "interrelated agreements," which include the Sales Agreement, the lease agreements, and the credit line agreements. (ECF No. 30 ¶ 80). According to FHR, the Bank's breach of those agreements "releases and/or suspends FHR's respective performance obligations under the agreements, including [the credit line Notes], and precludes the Bank's reliance on provisions providing for the confession[s] of judgment." (*Id*.). More specifically, FHR asserts that the Bank's notices of default were defective.

According to FHR, the validity of the Bank's confessed judgments depends on the validity of the Bank's termination of the Sales Agreement. (ECF No. 40 at 11-12; *see also*, ECF No. 27 at 19-22). FHR contends that the notices of acceleration dated May 18, 2010, the notices of default dated May 6, 2010, and the notice terminating the Sales Agreement dated May 6, 2010, are all interrelated and inseparable for the purpose of determining the validity of the confessed judgments. (ECF No. 40 at 12). FHR asserts that the Bank issued all of the notices based solely on its belief that FHR had defaulted under the Sales Agreement. (*Id*.). Accordingly, the argument goes, if FHR was not in default under the Sales Agreement, then the notices of default and acceleration were invalid, and therefore the Bank had no basis to confess judgment on the credit lines. (*Id*.). FHR completes its argument by asserting that it did not default on the Sales Agreement. (*Id*.).

FHR asserts that the Bank's sole basis for terminating the Sales Agreement was that FHR failed to close the transaction prior to October 30, 2009, as contemplated in the original Sales Agreement. (*Id*. at 13). However, according to FHR, the parties entered an oral agreement to indefinitely adjourn the closing date. (*Id*.). FHR argues that this binding

oral agreement to adjourn the closing date eliminates the Bank's sole basis for holding FHR in default under the Sales Agreement. (*Id*.). Therefore, FHR concludes, "[s]ince the Sales Agreement Termination was thus invalid, the Notices of Default were likewise invalid . . . making the subsequent Notices of Acceleration improper under the terms of the governing documents and the entry of judgment by confession equally improper." (*Id*. at 15). FHR's argument—which is nothing more than a confusing attempt at mental gymnastics—is unconvincing for a number of reasons.

### a.    The Agreements are Independent

First, the contractual obligations of the credit line Notes are independent from the Sales Agreement. FHR asserts that they are "interrelated." (ECF No. 30 ¶ 80). It is undisputed that the credit line agreements were part of a series of agreements between FHR and the Bank in an effort by the Bank to sell the Plant real estate and equipment to FHR. However, while the agreements might be "interrelated," inasmuch as the credit lines were executed within the larger context of the Bank selling the Plant to FHR, the credit line agreements contain contractual obligations independent from the other agreements and contemplate distinct remedies. Thus, for the purpose of an event of default and related remedies, the credit lines are governed by the credit line Notes and related documents.

Nothing in the credit line agreements condition enforcement of the Notes on the successful sale of the Plant to FHR. The credit lines were simply loans that FHR used as working capital during its failed attempt to acquire the Plant. While the parties may have discussed altering FHR's payment obligations on the credit lines during the negotiations related to the sale of the Plant, those negotiations failed, as explained below. Thus, FHR remains contractually liable under the terms of the credit line agreements and Notes. The

Bank confessed judgment on the credit lines because FHR failed to make payments on the credit lines, not because FHR defaulted on the Sales Agreement, which was the underlying basis for the Bank's confession of judgment in ejectment.

### b.    The Bank's Termination of the Sales Agreement

Next, even assuming the agreements are "interrelated," FHR's argument fails because its essential premise is flawed.   FHR contends the notices of default and acceleration on the credit lines were premised on the Bank's improper termination of the Sales Agreement.   Contrary to FHR's assertion, the Bank's termination of the Sales Agreement was not improper.

FHR's assertion that it "never breached or defaulted on the Agreement of Sale" (ECF No. 27 at 22) is simply not supported by the record.   FHR failed to close the sale by the October 30, 2009, contract deadline.   Also, FHR failed to tender the purchase price. FHR advised the Bank that it had been unable to secure the financing required to close the deal and then attempted to renegotiate the purchase price with the Bank.   (*See* ECF No. 39-15).   These undisputed facts conclusively demonstrate that FHR was in breach of the Sales Agreement and that the Bank's entry of default was proper under the governing documents.

FHR's argument that the parties indefinitely adjourned the closing date, requiring the Bank to set a new closing date and to give FHR a reasonable time to close on the transaction before entering default (*see* ECF No. 40 at 7), is without merit.   On this issue, the Court finds Judge Cherry's Opinion directly on point:

> On August 31, 2009, Bank and FHR entered into an Agreement for the Sale of Real Estate (hereinafter "Sales Agreement").   The Sales Agreement called for the sale of property, which is the subject of this suit, for a sum of $10 million.   Sales Agreement, p. 7, Section 3(a).   One-

quarter of the sale price, or $2.5 million, was to be payable to [the Bank] at the time of closing. *Id*. at 8, Section 3(c). Closing was scheduled for no later than October 30, 2009. *Id*. at 9, Section 5(b). Closing could be modified by written agreement of the parties. *Id*. The Sales Agreement, likewise, could be modified by written agreement of all parties. *Id*. at 16, Section 18.

No closing occurred on October 30, 2009. There is no evidence indicating that the closing date was modified in writing. It is not contested that FHR never made the $2.5 million due under the Sales Agreement. Additionally, there is no indication that any other term of the Sales Agreement was modified in writing by all parties. Therefore, Section 20 of the Sales Agreement discussing default by the buyer remains in full force:

> In the event that Closing does not occur on or before the Closing Date due to Buyer's default in the performance of the provisions thereof, Seller may either (a) disregard such default and perform this Agreement by tendering title and the premises in return for the Purchase Price, or (b) terminate this Agreement. . . . In the event Seller elects option (b), there shall be no further liability or obligations on either of the parties hereto and this Agreement shall become null and void.

As discussed above, closing did not occur on or before October 30, 2009, and no written agreement was reached between Bank and FHR which would have modified this deadline. Because a contract for the sale of real property must be in writing to satisfy the Statute of Frauds, 33 P.S. § 1; 13 Pa. C.S. § 2201, even if the Court accepts as true the allegation that there was an oral agreement between the parties, it is unenforceable.

Because the conditions set forth in the Sales Agreement did not occur and were not modified in writing, FHR was in default of its obligations. Pursuant to Section 16 of the Agreement, Bank was free to terminate the agreement by written notice, which it did when it sent FHR a letter dated May 6, 2010. The letter clearly states that it constituted formal written notice to FHR that Bank was considering it in default and terminating the Sales Agreement. Bank followed the procedures set forth in the Sales Agreement to have it declared null and void.

*       *       *

[T]he Sales Agreement called for $2.5 million to be tendered at the time of closing, which was scheduled for October 30, 2009. Neither the $2.5 million was tendered nor did closing occur on that date. The sale was

never consummated. Because of the default, Bank was free to exercise its termination rights under the contract, which [the Bank] effectively did.

(Cherry Opinion, ECF No. 39-21 at 11-12).

FHR has failed to support its assertion—that the Bank orally agreed to adjourn the closing date indefinitely—with any evidence. Instead, the record evidence shows that when it became clear to the Bank that FHR was unable to secure sufficient financing for the purchase price and when FHR and the Bank were subsequently unable to renegotiate the terms of the Sales Agreement, the Bank terminated the Sales Agreement. There is simply no evidence in the record that the Bank's termination of the Sales Agreement was somehow defective or unlawful.

To the contrary, the Bank properly exercised its rights under the Sales Agreement because FHR failed to comply with the terms of the Sales Agreement and was unable to negotiate a new deal with the Bank. *See New Eastwick Corp. v. Philadelphia Builders Eastwick Corp.*, 241 A.2d 766 (Pa. 1968) (holding a party who merely remains silent and allows a termination date to pass without comment is not estopped from exercising its termination option); *Nat'l Data Payment Sys., Inc. v. Meridian Bank*, 212 F.3d 849, 856 (3d Cir. 2000). Accordingly, because the Bank's termination of the Sales Agreement was legally justified and not improper, FHR's argument fails, and its first defense is without merit.

### 3.     Good Faith Negotiation, Estoppel, and Detrimental Reliance

The next three defenses are based on FHR's allegations that the Bank promised to renegotiate the various agreements between the parties. FHR contends that the Bank, despite its promises, failed to negotiate the agreements with FHR in good faith (ECF No. 30 ¶ 81), that FHR detrimentally relied on the Bank's various promises (ECF No. 30 ¶ 84),

and that the Bank should thus be estopped from exercising its rights with respect to the credit line Notes (ECF No. 30 ¶ 83). These three defenses are without merit. FHR's arguments involve two related promises. First is the alleged promise that the Bank would renegotiate the "interrelated" agreements to sell the Plant real estate and equipment to FHR for a new, reduced price. Second is the alleged promise that the Bank would reduce FHR's payment obligations on the credit lines. While there is significant overlap in the two arguments, the Court will nevertheless address each under a separate heading.

### a. The Bank's Promise to Renegotiate the Sales Agreement

FHR asserts that the Bank orally agreed to modify the Sales Agreement, but then failed to negotiate in good faith or consummate the new agreement. (ECF No. 30 ¶ 81). Specifically, FHR claims that the Bank agreed to indefinitely adjourn the closing date pending further negotiations and agreed to "restructure the price of the purchase of the Premises and equipment." (ECF No. 30 ¶ 28). The Court finds Judge McVerry's analysis on this issue controlling:

> Plaintiff alleges that after entering into the Agreement of Sale and related documents in the summer of 2009, the Bank and FHR agreed to restructure their relationship in light of changed economic circumstances. Plaintiff avers that the parties agreed to adjourn the closing date *sine die* (i.e., indefinitely) and "to negotiate in good faith to restructure the terms of the interrelated transactions. . . ." Paragraph 108. Plaintiff further avers that over the next nine months FHR was permitted to remain in possession of the Facility and to make further borrowings from the Bank and other sources and to expend resources to develop its business. Paragraph 110 alleges that the Bank and FHR, in fact, "engaged in ongoing discussions and negotiations for the acquisition of the Premises. . . ."

> In *Luther v. Kia Motors America, Inc.*, 676 F.Supp.2d 408 (W.D. Pa. 2009), the Court provided a concise summary of the legal principles which govern promissory estoppel claims:

>> To establish a promissory estoppel claim under Pennsylvania law, the plaintiff must show that

25

1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee;

2) the promisee actually took action or refrained from taking action in reliance on the promise; and

3) injustice can be avoided only by enforcing the promise.

Promissory estoppel is "an equitable remedy to be implemented only when there is no contract; it is not designed to protect parties who do not adequately memorialize their contracts in writing."

The elements of promissory estoppel are "(1) misleading words, conduct or silence by the party against whom the estoppel is asserted; (2) unambiguous proof of reasonable reliance on the misrepresentation by the party seeking to assert the estoppel; and (3) no duty of inquiry on the party seeking to assert estoppel." These elements must be established by "clear and convincing evidence."

To succeed on a promissory estoppel claim, the plaintiff must further establish that the action he took "amounted to a substantial change of position." A claim for estoppel cannot survive when the plaintiff's actions were based on "his own will and judgment" rather than the defendant's representations.

*       *       *

In essence, Plaintiff contends that the Bank promised continually to renegotiate based on the original Agreement of Sale and finally agreed on a restructured transaction price in April 2010. The Bank contends that a promise "to negotiate in good faith" is not sufficiently definite to support a promissory estoppel claim and that FHR could not reasonably rely on such a promise.

The Court agrees with the Bank. The facts[ . . . ]do not support a valid promissory estoppel claim. The Bank's alleged promise to negotiate in good faith is not sufficiently concrete to be enforceable or to induce reasonable reliance on the part of a sophisticated party such as FHR. *See B & P Holdings I, LLC v. Grand Sasso, Inc.*, 114 Fed. Appx. 461, 466 (3d Cir. 2004) (non-precential) ("An agreement to negotiate in good faith does not guarantee the ultimate execution of a final contract. There is nothing to indicate that, had the parties negotiated in good faith, a final agreement necessarily would have been reached.") On the face of the Amended Complaint, essential terms (such as timing, price and Abramson's personal liability for the unpaid $2,500,000) remained unresolved for many months.

Thus, in continuing to invest in the business FHR assumed the risk that acceptable terms would not be reached. Moreover, the Amended Complaint avers that the Bank did, in fact, engage in extensive and lengthy negotiations with FHR in an effort to reach acceptable terms. The discussion in *GMH Associates, Inc. v. Prudential Realty Group*, 752 A.2d 889, 904-05 (Pa. Super. 2000), is analogous and instructive:

> It is clear, in our view, that the negotiations for the sale of the Property did not go as expected by the parties due, in part, to GMH's request for a $3 million reduction in the LOI purchase price and its inability to secure the Allegheny transaction in a timely fashion. We will not conclude that Prudential's "promise" to keep the Property off the market was enforceable in the face of the apparent difficulties the parties encountered in closing the transaction. Since Prudential kept the Property off the market for three months during which time the proposed transaction was not consummated, we do not find the doctrine of promissory estoppel available to bind it to continue to keep the Property off the market seemingly indefinitely.

> *See also Josephs v. Pizza Hut of America, Inc.*, 733 F.Supp. 222 (W.D. Pa. 1989) (statement that corporate approval of lease was a "mere formality" was not sufficient to support promissory estoppel claim).

*      *      *

In this case, the Bank permitted FHR to remain in possession of the Facility for over nine months while the parties engaged in extended negotiations. As in *GMH Associates,* the Bank was not required to allow FHR to remain in possession of the Facility indefinitely and a promissory estoppel claim cannot be based on the Bank's alleged breach of a promise to negotiate in good faith.

*Catahama, LLC v. First Commonwealth Bank*, No. 2:10-cv-1140, 2011 WL 2533018 (W.D. Pa. June 24, 2011) (Judge McVerry) (dismissing FHR's complaint against the Bank); *see also B&P Holdings I, LLC. v. Grand Sasso, Inc.*, 114 F. App'x 461, 465-66 (3d Cir. 2004). The Court finds Judge McVerry's analysis equally applicable to FHR's defense that the Bank failed to negotiate in good faith with respect to new payment obligations on the credit line Notes.

### b.     The Bank's Assurances Regarding the Notices of Default

FHR also asserts that the Bank should be estopped from relying on the notices of default because the Bank assured FHR that it would not act on them and that they were not intended "to be taken seriously or responded to."  (ECF No. 40 at 15, 17).  According to FHR, the Bank orally assured FHR "that the Bank did not intend to follow up on the Notices of Default, but was simply filing them 'for the record' so the Bank could obtain leverage over Mr. Abramson."  (*Id*. at 16).  FHR claims that a representative of the Bank, David Hepler, told Jack Gray of FHR during a phone conversation that the notices were merely a formality.  (ECF No. 30 ¶¶ 43-44; ECF No. 40 at 16).  Hepler allegedly told Gray to disregard the notices and not to make any of the payments demanded in the notices. (*Id*.).  FHR asserts that it detrimentally relied on the Bank's promises and assurances and that the Bank should now be estopped from enforcing the credit line Notes.  (ECF No. 40 at 17-18).  Even assuming FHR's allegations are true, FHR's argument is without merit.

The notices of default and notices of acceleration were sent in compliance with the default provisions of the credit line Notes after FHR failed to make the required payments. FHR concedes that it was delinquent on its payments under the credit lines Notes.  (ECF No. 47-1 at 1, 3, 5).  Because of the delinquent payments, on May 6, 2010, the Bank sent a notice of default for each credit line to FHR.  (ECF No. 39-17 at 2, 6).  The Notices stated

> FHR is in default under the terms of the Loan Agreement and Note for failing to make the required payments of interest on the Note for April 1, 2010, and May 1, 2010.  FHR shall have ten (10) days from and after the date of this letter to cure the default by payment of [$7,568.29 on the revolving line of credit and $35,688.59 on the non-revolving line of credit].

> In the event that the total amount necessary to cure the default [$7,568.29 and $35,688.59 respectively] is not received by the Bank by 5:00 pm (EST) on May 17, 2010, the Bank intends to exercise its remedies under

the Loan Agreement, Note, any other document or agreements executed in connection with [the lines of credit].

(*Id.* at 6). Each notice also cross-referenced the default on the other line of credit and explained that it was necessary to cure that default as well. (ECF No. 39-17 at 3, 7).

After FHR failed to cure the defaults as directed in the notices, the Bank sent a notice of acceleration for each credit line to FHR, which explained,

[A]s a result of the failure of FHR to cure the defaults, the Bank has elected to accelerate the maturity of the Note and hereby declares the outstanding balance of the Obligations (as defined in the Note) to be immediately due and payable in full.

(ECF No. 39-18 at 2, 4). The notices also stated that payment was due immediately and that if FHR failed to pay its obligations in full, the Bank would exercise its remedies under the credit line Notes and related documents. (*Id.* at 3, 5). On August 10, 2010, the Bank filed a complaint in confession of judgment on each line of credit. (ECF No. 39-1 at 2).

In sum, the evidence in the record demonstrates FHR was in default on both lines of credit; the Bank notified FHR of the default and of its intent to exercise its remedies under the Notes; FHR failed to cure the default; and, the Bank exercised its remedies by accelerating FHR's obligations and executing the confessions of judgment. Apart from alleging that a representative of the Bank told FHR in a phone conversation that FHR could disregard the notices of default, FHR has provided no evidence demonstrating that it was unlawful for the Bank to exercise its rights under the Notes.

In fact, the record clearly shows that FHR knew it was in default on its payments and that FHR knew the Bank had demanded the delinquent payments. For example, Jack Gray of FHR testified that David Hepler asked FHR to make payments on the delinquent

credit lines.  (*See* ECF No. 39-14 at 6).  Gray also testified the reason FHR stopped making payments on the credit lines was because FHR "didn't have the money."  (*Id*. at 7-8).

As noted above, to establish a promissory estoppel claim, FHR must show that (1) the Bank made a promise that it should have reasonably expected to induce action or forbearance on the part of the FHR; (2) FHR actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise.  *Luther v. Kia Motors America, Inc.*, 676 F.Supp.2d 408, 421 (W.D. Pa. 2009).

As evidenced in the record before the Court, the Bank's efforts to keep the Plant operating and to complete the deal with FHR proceeded over several months, but without clear documentation.  Even assuming that Hepler made promises on behalf of the Bank and that FHR relied on those promises, FHR has failed to demonstrate that the Court should act to avoid injustice by enforcing the alleged oral promise because FHR, a sophisticated corporate entity, failed to protect itself in writing, despite the fact that numerous written agreements between the parties existed that contemplated very different terms from the alleged oral agreement.

In *Thatcher's Drug Store*, the Pennsylvania Supreme Court rejected a promissory estoppel claim where "the terms of the agreement were vague and at risk of being misunderstood" and the parties had failed to exercise "the caution demanded by a situation in which each had significant rights at stake."  *Thatcher's Drug Store of West Goshen, Inc. v. Consolidated Supermarkets, Inc.*, 636 A.2d 156, 161 (Pa. 1994).  In *Thatcher's Drug Store*, "[T]he Court observed that the commercial setting and witness credibility disputes actually weighed against estoppel—because such considerations illustrated the need to formalize any agreement.  The same reasoning applies under the facts and circumstances of

this case, even when viewed in the light most favorable to [FHR]." *Catahama, LLC v. First Commonwealth Bank*, No. 2:11-cv-583, 2013 WL 5874578, *6-7 (W.D. Pa. Oct. 31, 2013).

Here, the only formalized agreements between FHR and the Bank are the very agreements that the Bank relied on in its confessions of judgment, and which FHR now seeks to repudiate. The mere fact that the Bank did not exercise its rights for a period of time after FHR's default does not mean that the Bank was forever barred from acting. The Bank had a pre-existing, perfected security interest in all of FHR's assets, as well as the right to terminate the Sales Agreement and the right to confess judgment on the credit lines. FHR acted at its own risk by failing to make required payments on the credit lines.

Even accepting FHR's allegations concerning Hepler's promise as true, the allegations do not indicate how long the Bank was willing to forgo payment to cure the default, or how the parties were to resolve the issue. FHR could have cured the default or could have requested that the agreement be memorialized in writing. However, FHR—a sophisticated business entity—failed to do either. Accordingly, FHR's promissory estoppel and detrimental reliance defenses are without merit. *See Luther v. Kia Motors Am., Inc.*, 676 F. Supp. 2d 408, 421-23 (W.D. Pa. 2009); *Selzer v. Dunkin' Donuts, Inc.*, No. 09-cv-5484, 2013 WL 4547812, *4-5 (E.D. Pa. Aug. 28, 2013).

In sum, FHR has failed to demonstrate with clear, direct, and believable evidence any meritorious defenses under theories of promissory estoppel, detrimental reliance, and failure to negotiate in good faith.

### 4.    Oral Modification of the Payment Obligations

Next, FHR asserts that the Bank orally modified FHR's payment obligations on the credit lines Notes.  (ECF No. 30 ¶ 82).  According to FHR, the Bank entered a binding oral agreement that modified the credit line agreements, in which "the Bank would accept $2.1 million in full satisfaction of its claims under both lines of credit" rather than the combined $3.7 million demanded in the complaints for judgment by confession.  (ECF No. 27 at 23; ECF No. 30 ¶ 65-68).

In response, the Bank argues that any negotiations concerning FHR's payment obligations were made within the context of renegotiating the Sales Agreement for the Plant real estate, and that the Statute of Frauds therefore applies.  The Bank also argues that Judge McVerry already decided this issue[12] and that FHR has failed to allege the requisite elements for a contract.  (ECF No. 19 at 25).

### a.    Statute of Frauds

The Bank contends that FHR's oral modification defense fails under the Statute of Frauds.  According to the Bank, the discussion concerning the payment obligations on the credit lines was simply part of an attempt by the parties to renegotiate the terms of the Sales Agreement, a negotiation that ultimately failed to produce any formal contract.  The Bank asserts that, because the parties failed to reach a written agreement concerning the Sale of the Plant, the discussion between the parties related to a new payment option on the credit lines is not enforceable.  The Court agrees.

---

[12] The Court agrees, see the excerpt from Judge McVerry's Opinion included above, but will nevertheless evaluate the parties' arguments.

FHR argues that the Statute of Frauds does not apply to oral contracts related to credit loans and asserts that the Bank improperly conflates the modification of the Sales Agreement and the oral modification of the credit line payment obligations. FHR's claim is disingenuous.[13] Throughout its Petitions, FHR claims that the Bank orally agreed to modify the Sales Agreement, and attempts to tie the new oral agreement concerning the credit lines to the new sales arrangement, claiming all of the agreements are "interrelated" and "inseparable." FHR's own allegations demonstrate that the negotiations that took place after the original closing date were clearly an attempt by the parties to salvage the failed sale of the Plant real estate and equipment. Discussions concerning new payment obligations on the credit lines were merely a part of the renewed negotiations for the sale of the Plant. FHR alleges in its Petitions:

> 28. . . . Bank[ ] promise[d] to restructure the **price of the purchase of the Premises** and equipment and . . . to defer payment obligations under the lines of credit . . .

> 40. The Bank advised FHR that the Bank would **modify the Agreements, so as to sell the Premises**, the Equipment and satisfy the outstanding amounts due on the credit lines for cash payment of $18,600,000.

> 41. . . . [FHR] was in a position to fully consummate its **renegotiated transaction** with the Bank, and could . . . finalize **acquisition of the Property** and Equipment from the Bank . . .

> 42. . . . the Bank continued to **negotiate the modification of the financial terms of the agreements** so that the **closing of all the sale of the Premises** and the equipment could occur.

> 65. The Bank agreed to close the transaction for the **sale of the Property for $16.5 million** and stated that it would send a simple contract

---

[13] An important distinction is noted here. The Court previously concluded that the Sales Agreement and credit line agreements were independent and not "interrelated." The Court now finds that the ***negotiations***— not the actual, existing ***agreements***, as before—concerning the purchase price for the sale of the Plant and the payment obligations on the credit lines were inseparably linked. The purpose for the continued negotiations during 2010 was an attempt by the parties to complete the sale of the Plant.

of sale the next business day. The Bank also agreed to continue to negotiate the resolution of the issues involving the credit lines.

80. By reason of the foregoing, the Bank and FHR, through their conduct, **orally modified the agreements** . . .

(ECF No. 30 ¶¶ 28, 40, 41, 42, 65, 80) (emphasis added). Thus, FHR's own allegations demonstrate that the purpose of the parties' negotiations was an attempt to finalize the sale of the Plant real estate. Because the purported agreement involved the sale of real estate, the Statute of Frauds applies.

Under Pennsylvania's Statute of Frauds, an agreement for the sale of real estate may not be enforced unless it is in writing and signed by the seller. 33 P.S. § 1; *Hostetter v. Hoover*, 547 A.2d 1247, 1250 (Pa. Super. Ct. 1988); *Gerlock v. Gable*, 112 A.2d 78, 81 (Pa. 1955) (explaining the Statute of Frauds requires contracts for the sale of real estate to be in writing). The Statute of Frauds requires "a memorandum in writing signed by the parties to be charged which sufficiently indicates the terms of the contract and the property to be conveyed." *Brown v. Hahn*, 213 A.2d 342, 347 (Pa. 1965). The purpose of the Statute of Frauds is to prevent perjury and fraudulent claims, and its effect is to render oral contracts for the sale of real estate unenforceable. *In re Scheffler*, 471 B.R. 464, 492 (Bankr. E.D. Pa. 2012); *Fannin v. Cratty*, 480 A.2d 1056, 1058-59 (Pa. Super. Ct. 1984). Its aim "is the prevention of successful fraud by inducing the enforcement of contracts that were never in fact made." *In re Estate of Beeruk*, 241 A.2d 755, 758 (Pa. 1968). "It eschews exalting 'informality in the memorandum or its incompleteness in detail [which] neither promotes justice nor lends respect to the statute.'" *In re 400 Walnut Associates, L.P.*, 454 B.R. 60, 67 (Bankr. E.D. Pa. 2011) (quoting *Axler v. First Newport Realty Investors*, 420 A.2d 720, 722 (Pa. Super. Ct. 1980)).

Nevertheless, Pennsylvania courts will uphold an oral agreement to convey real estate, despite the Statute of Frauds, if certain requirements are met. *See Firetree, Ltd. v. Department of General Services*, 978 A.2d 1067, 1074-75 (Pa. Commw. Ct. 2009). "[A] buyer advancing an oral agreement for the sale of real property must prove four elements: (1) The terms of the agreement are full and complete and are satisfactorily set forth; (2) the amount of the consideration to be paid is well-established; (3) the buyer possesses the property pursuant to the terms of the agreement, openly and notoriously; and (4) buyer's obligations have been partially or fully performed, thereby making rescission inequitable and unjust." *In re Scheffler*, 471 B.R. 464, 492 (Bankr. E.D. Pa. 2012). These elements must be established "beyond a doubt." *Firetree*, 978 A.2d at 1075 (citing *Kurland v. Stolker*, 533 A.2d 1370, 1373 (Pa. 1987)). FHR has not satisfied any of these elements.

Accordingly, because the purported oral agreement involves the sale of the Plant real estate, the Statute of Frauds applies. However, FHR has not alleged or produced any written agreements modifying the "interrelated agreements," including the Agreement of Sale, credit line agreements, Plant equipment lease, or any of the other agreements between the parties. In fact, FHR concedes that the alleged new agreement was never reduced to writing. (ECF No. 39-14 at 10). Thus, even assuming that the Bank entered some kind of oral agreement with FHR, the new agreement is unenforceable under the Statute of Frauds. Because the agreement was never memorialized in writing, FHR's defense is without merit.

### b. Insufficient Evidence of Contract Terms

Even if the Statute of Frauds did not apply, FHR has nevertheless failed to demonstrate that the parties entered an oral contract. Both of the credit line Notes contain

the following clause: "No amendment to or modification of this Note shall be effective unless set forth in writing and signed by Borrower and Lender." (*See* ECF No. 39-1 at 16). FHR has not provided any evidence that the parties entered a written modification. Instead, FHR alleges the Bank orally agreed to a modification.

However, this contract provision alone will not defeat FHR's argument, for "it is well settled under Pennsylvania law that a written agreement can be modified or amended by a subsequent [oral] agreement," notwithstanding language in the contract to the contrary. *Crown Coal & Coke Co. v. Powhatan Mid-Vol Coal Sales, L.L.C.*, 929 F. Supp. 2d 460, 467-68 (W.D. Pa. 2013). Concerning the issue of oral modifications, Pennsylvania law is clear:

> An oral contract changing the terms of a written contract must be of such specificity and directness as to leave no doubt of the intention of the parties to change what they had previously solemnized by a formal document. The oral evidence must be of such a persuasive character that it moves like an ink eradicator across the written paper, leaving it blank so that the parties in effect start afresh in their . . . mutual commitments.

*Hamilton Bank v. Rulnick*, 475 A.2d 134, 137 (Pa. Super. Ct. 1984) (quoting *Gloeckner v. Sch. Dist. of Baldwin Twp.*, 175 A.2d 73, 75 (Pa. 1961)). Thus, "where the writing contains an express provision that it constituted the entire contract between the parties and should not be modified except in writing, the party seeking to show subsequent oral modification in the agreement must prove it by clear, precise, and convincing evidence." *Empire Properties, Inc. v. Equireal, Inc.*, 674 A.2d 297, 304 (Pa. Super. Ct. 1996) (quoting *Nicolella v. Palmer*, 248 A.2d 20, 23 (Pa. 1968)); *see also Pellegrene v. Luther*, 169 A.2d 298, 300 (Pa. 1961) ("[An] oral contract which modifies or changes or cancels a prior written contract must be proved by evidence which is clear, precise and convincing.").

"The elements of an enforceable contract under Pennsylvania law are: (1) a manifestation of an intent to be bound by the terms of the agreement, (2) sufficiently definite terms, and (3) an agreement supported by adequate consideration." *Legendary Art, LLC v. Godard*, 888 F. Supp. 2d 577, 585 (E.D. Pa. 2012). Regarding the second element, sufficiently definite terms, Pennsylvania has adopted the Restatement (Second) of Contracts, which requires that the terms of the contract be reasonably certain. *Id*. at 586 (citing *Reed v. Pittsburgh Bd. of Pub. Educ.*, 862 A.2d 131, 135 (Pa. Commw. Ct. 2004)). For the terms of the contract to be reasonably certain, they must "provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Id*. (quoting Restatement (Second) of Contracts § 33 (1981)). Likewise, open terms of a proposed agreement may show that a manifestation of intention is not intended to be understood as an offer or acceptance, for "[i]ncompleteness of terms is one of the primary reasons statements of preliminary negotiations are not deemed offers." *Id*. (quoting *Reed*, 862 A.2d at 135).

Regarding the credit lines, FHR's Petitions allege that "the Bank insisted upon payment of $2.1 million . . . [and] agreed to FHR's proposal that the $2.1 could be paid by FHR's payment of a $.50 per case fee, provided that FHR agree to a balloon payment which was guaranteed." (ECF No. 30 ¶¶ 66-68; *see also* ECF No. 40 at 7, 10-13). Despite this assertion, FHR has not proffered any allegations or evidence concerning the essential terms of the oral contract. In fact, the evidence in the record demonstrates that the Bank's alleged offer to restructure the agreement and reduce the amount due on the credit lines was simply part of the parties' unsuccessful attempt to finally consummate the sale of the Plant real estate and equipment. However, the Bank found FHR's offer unacceptable and

the parties never finalized any agreement. Furthermore, FHR has failed to identify additional consideration to support the contractual modification as required by Pennsylvania law. *See Barnhart v. Dollar Rent-A-Car Sys., Inc.*, 595 F.2d 914, 919 (3d Cir. 1979); *Nicolella v. Palmer*, 248 A.2d 20, 23 (Pa. 1968).

Accordingly, because FHR has failed to demonstrate with clear, precise, and convincing evidence that the parties established the essential terms of an oral contract modifying the credit line agreements, FHR's defense is without merit. *See Morilus v. Countrywide Home Loans, Inc.*, 651 F. Supp. 2d 292, 309 (E.D. Pa. 2008) (citing *Corestates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

### 5. Deprivation of Due Process Defense

Finally, FHR asserts that the agreements contain certain clauses "under which FHR would be deprived of any rights of due process, including the right to assert defenses against it by the Bank." (ECF No. 30 ¶ 85). FHR further avers, "Basic due process considerations require that FHR be granted the opportunity to demonstrate that it has bona fide defenses to the claims on which the confessed judgments are based." (*Id*. ¶ 7).

Undoubtedly, a "[c]onfession of judgment is a powerful tool, . . . which implicates important due process concerns." *Ohio Casualty Ins. Co. v. LRS Construction, Inc.*, No. 2:07-mc-331, 2008 WL 4533677, *6 (W.D. Pa. Oct. 3, 2008). Nevertheless, the law is clear that "Pennsylvania's practice in allowing the entry of judgments by confession is not unconstitutional." *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1270 (3d Cir. 1994). Further, the Third Circuit has confirmed that "a judgment against a reasonably sophisticated, corporate debtor who has signed an instrument containing a document permitting judgment by confession as part of a commercial transaction is enforceable in the

same manner as any other judgment." *Id*. at 1272. When faced with a due process challenge to a confessed judgment, a court must inquire whether execution of a document permitting judgment by confession was a valid waiver of the judgment debtor's constitutional right to pre-deprivation notice and hearing. *Id*.; *see also F.D.I.C. v. Deglau*, 207 F.3d 153, 168-69 (3d Cir. 2000).

Here, the evidence demonstrates that FHR, a sophisticated corporate entity, with the advice of counsel, knowingly, intelligently, and voluntarily signed a Promissory Note containing a confession of judgment clause. The confession of judgment clause is clear and conspicuous. *See Provco Leasing Corp. v. Safin*, 402 A.2d 510, 513 (Pa. Super. Ct. 1979) (holding a confession of judgment clause that was "clear, understandable and obvious" was enforceable). The clause is contained in the Promissory Note and is set apart in a paragraph with bold text distinguishing it from the rest of the Note, with the words "CONFESS JUDGMENT" in all capital letters. (*See* ECF No. 39-1, at 15). Likewise, the Promissory Note contains a waiver of trial by jury clause, which is similarly set apart in a paragraph with bold text, in which FHR "knowingly, voluntarily and intentionally waives the right it may have to a trial by jury in respect of any litigation." (*Id*. at 16). Additionally, FHR signed a separate "Disclosure for Confession of Judgment," in which FHR acknowledged, while represented by FHR's "own independent legal counsel in connection with the Note," that the confession of judgment provision contained in the note

> would permit [the Bank] to enter judgment against [FHR] in Court, after a default on the Note, without offering [FHR] an opportunity to defend against the entry of judgment. In executing the Note, being fully aware of [FHR's] rights to advance notice and to a hearing to contest the validity of any judgment or other claims . . . [FHR] is knowingly, intelligently and voluntarily waiving these rights . . .

(*Id*. at 18).

Apart from its bald assertion that certain clauses in the agreements would deprive FHR of its due process rights, FHR has not presented any specific violations of due process. To the contrary, FHR has been afforded ample opportunity—before this Court, before Judge McVerry, and before Judge Cherry—to assert its defenses. Accordingly, in light of all the foregoing, FHR's due process argument is without merit.

### 6. Conclusion

In alleging a meritorious defense to support the opening of a confessed judgment, "a petitioner must 'provide enough evidence to support the defense to the extent of creating a jury issue.'" *Textron Fin. Corp. v. Vacation Charters, Ltd.*, No. 3:11-cv-1957, 2012 WL 760602, *6 (M.D. Pa. Mar. 8, 2012) (quoting *Liazis*, 618 A.2d at 452). Here, FHR has simply failed to present evidence that, if established at trial, would constitute a meritorious defense. *See Sovereign Bank v. Catterton*, No. 03-cv-4954, 2003 WL 23162405, *6 (E.D. Pa. Dec. 3, 2003). Accordingly, the Court will decline to open the confessed judgments.

### B. FHR's Petitions to Strike the Judgments

As an alternative to its Petition to open, FHR has moved to strike the confessed judgments. As explained above, a court may strike a confessed judgment only "where there is an apparent defect on the face of the record on which the judgment was entered." *Germantown Sav. Bank v. Talacki*, 657 A.2d 1285, 1288 (Pa. Super. Ct. 1995). In determining whether there is a fatal defect on the record's face, a court may only review the confession of judgment clause and the complaint itself and must accept the facts alleged in the complaint as true. *Deglau*, 207 F.3d at 167. The burden of proof rests with the party against whom judgment was confessed, who must disprove the facts contained in the complaint. *Davis v. Woxall hotel, Inc.*, 577 A.2d 636, 638 (Pa. Super. Ct. 1990).

Initially, the Court notes that FHR has not asserted any specific defects in the judgment. Instead, while FHR captioned its motion as a "Petition to Open and/or Strike Judgment," the allegations asserted in the Petitions and the arguments presented in the supporting briefs and at oral argument focus exclusively on the defenses related to the Petitions to open the judgment. Accordingly, because FHR has presented no argument that the judgments were facially invalid, the Court will deny the motions to strike. *See Textron Fin. Corp. v. Vacation Charters, Ltd.*, No. 3:11-cv-1957, 2012 WL 760602, *2 (M.D. Pa. Mar. 8, 2012). Furthermore, the Court has carefully reviewed the confession of judgment clauses and the complaints and can find no apparent defect on the face of the record.

## VI.    CONCLUSION

In sum, FHR failed to make required payments on the two credit lines that it held with the Bank. Upon FHR's default and pursuant to the governing loan documents, the Bank executed a judgment by confession in state court on each line of credit. The matter having come before this Court, FHR has failed to produce evidence to support its asserted defenses such that the judgments should be opened and the defenses submitted to a jury. Having considered each of FHR's defenses and for the reasons stated above, the Court will decline to open or strike the confessed judgments. Accordingly, FHR's Petitions are **DENIED**. An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FIRST COMMONWEALTH BANK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO. 3:10-231** |
| **v.** | ) | |
| | ) | **JUDGE KIM R. GIBSON** |
| **FRESH HARVEST RIVER, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### ORDER

**AND NOW**, this ___3rd___ day of March, 2014, upon consideration of Fresh Harvest River, LLC's petition to open and/or motion to strike confession of judgment and motion to stay enforcement of judgment (ECF No. 30), and upon further consideration of the parties' briefs and supporting exhibits, and the oral argument presented to the Court, and for the reasons set forth in the foregoing memorandum,

    **(1) IT IS HEREBY ORDERED** that Fresh Harvest River, LLC's petition to open judgment is **DENIED**;

    **(2) IT IS FURTHER ORDERED** that Fresh Harvest River, LLC's motion to strike judgment is **DENIED**;

    **(3) IT IS FURTHER ORDERED** that Fresh Harvest River, LLC's motion to stay enforcement of judgment is **DENIED**;

    **(4) AND FINALLY,** the Clerk is **ORDERED** to close this case.

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**